J-S66024-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES MOORE | : | |
| | : | |
| Appellant | : | No. 1562 EDA 2019 |

Appeal from the Order Entered May 23, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-1004221-2005,
CP-51-CR-1004231-2005

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES MOORE | : | |
| | : | |
| Appellant | : | No. 1563 EDA 2019 |

Appeal from the Order Entered May 23, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-1004221-2005,
CP-51-CR-1004231-2005

BEFORE:  STABILE, J., NICHOLS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY NICHOLS, J.:                **FILED DECEMBER 8, 2020**

Appellant James Moore appeals from the orders dismissing his timely first Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546, petitions without a hearing.  Appellant claims that the PCRA court erred in not holding an evidentiary hearing or granting a new trial on his claims related to trial counsel's failures to (1) file a motion to bar retrial, (2) challenge the

competency of one of the Commonwealth's witnesses, (3) request a jury instruction, and (4) litigate a **Bruton**[1] issue. We affirm.

This Court summarized the factual and procedural history of Appellant's convictions in Appellant's direct appeal.

> Appellant and his co-defendant, Larry Alexander, were drug dealers in North Philadelphia. The two victims, William Andre Kennedy and Jermaine Williams, were also drug dealers. The four men got into a dispute over drugs, money, and the drug-dealing territory on 11th Street between Russell and Ortana Streets. According to Khalid Coffield, another drug dealer, on April 29, 2005—the night before the murders—the defendants and victims got into an argument in the street over drugs. Andre Lane, another drug dealer, told police that Appellant, Alexander, and several others planned to murder Jermaine Williams and Kennedy.
>
> Late in the evening of April 30, 2005, Appellant arrived at the residence of Kennedy's uncle, looking for Kennedy and a package of crack cocaine. Appellant left and returned with a second man. The two punched the uncle in the face, forced their way into the apartment, searched it but found neither Kennedy nor drugs, and left. Before he was killed, Kennedy was living on 11th Street with Sonia Noemi Leon, a drug user with mental-health issues. On the evening of April 30, 2005, while Kennedy and Leon were smoking marijuana, Kennedy's cellphone began to ring. Leon recognized the caller's number as Alexander's, but she overheard Appellant's voice on the other end of the conversation. Appellant said he and Alexander wanted to meet Kennedy at the nearby Chinese food store on Rising Sun Avenue. A short time later, Jermaine Williams arrived at Leon's apartment to pick up Kennedy in his car. Leon told Kennedy not to go, but he got into Williams's car, and the two drove away and turned onto Rising Sun Avenue toward the Chinese food store. Then, Leon heard gunshots. Marvin Williams, who also knew the defendants and victims, lived across the street from the Chinese food store. Early in the morning of May 1, 2005, Marvin Williams saw the two victims outside of the Chinese food store. He saw Alexander approach Kennedy, pull a gun, and shoot him. Marvin Williams saw Appellant fire several shots at Jermaine

---

[1] **Bruton v. United States,** 391 U.S. 123 (1968).

Williams. Then, the defendants ran away. Responding police officers arrived, and Marvin Williams tussled with them. He tried to grab one of their side arms, and was arrested.

After Appellant and Alexander fled the scene of the crime, they went to a party at Khalid Coffield's house. At the party, Appellant—while still holding the murder weapon—described in detail to Andre Lane how he shot Jermaine Williams twice in the head, killing him.

Police officers responding to the sound of gunshots found Kennedy in the passenger seat of Jermaine Williams's car with multiple gunshot wounds to the head. Officers found Jermaine Williams outside of the Chinese food store, barely breathing and unable to speak. Jermaine Williams was taken to the hospital with multiple gunshot wounds to the torso, where he was pronounced dead. An autopsy revealed that Kennedy had been shot seven times in the head and upper torso. Jermaine Williams was shot ten times in the upper body. Evidence collected from the victims' bodies and the crime scene indicated that the perpetrators had used two firearms, one using 10 mm/.40 caliber cartridges, and the other using 9 mm/.357 SIG caliber cartridges.

At about 8:00 a.m. on the morning of May 1, 2005, Appellant appeared at the door of Leon's house. Appellant was looking for drugs, but Leon said there were none in her house. Appellant responded, "if you don't give them to me now, the same thing that happened to Jermaine Williams and Kennedy will happen to you." Upon searching her house, Leon found drugs and packaging material, which she hid. Leon's house was burglarized later that day, and she gave a statement to police about the murders.

While Marvin Williams and Alexander were incarcerated together, Alexander told Marvin Williams that he had shot Kennedy seven times and that he was worried about Appellant "running his mouth." Later in 2005, while Marvin Williams was serving a prison sentence, his mother told him that his car had been firebombed while it was parked in front of the Chinese food store. Marvin Williams believed that the firebombing was because he had testified at the preliminary hearing in this case.

Philadelphia Police developed Appellant and Alexander as suspects, and arrested and charged them each with two counts of first-degree murder, one count of conspiracy to commit murder, and three violations of the Uniform Firearms Act (VUFA).[fn2] At Appellant and Alexander's first two trials in 2007 and 2011, the

juries were unable to reach a verdict. At Appellant and Alexander's third trial in 2012, the jury convicted Appellant of conspiracy, two counts of first-degree murder, and two VUFA. The trial court immediately sentenced Appellant to two concurrent, mandatory terms of life without parole and imposed no further penalty on the other convictions.

> [fn2] 18 Pa.C.S.[] §§ 2502(a), 903, 6105 (person not to possess firearms), 6106 (carrying firearms without a license), and 6108 (carrying firearms on a public street in Philadelphia), respectively.
>
> [Appellant was charged in CP-51-CR-1004221-2005 (4331-2005)] for the killing Jermaine Williams and in CP-51-CR-1004231-2005 (4231-2005) for the killing of Kennedy]. Appellant and Alexander were tried together [for both murders]. The jury found Alexander guilty of conspiracy, and two counts of first-degree murder. . . .

**Commonwealth v. Moore**, 717 EDA 2013, at 1-6 (Pa. Super. filed July 21, 2014) (unpublished mem.) (citations omitted and formatting altered).

This Court affirmed Appellant's judgments of sentence, and the Pennsylvania Supreme Court denied Appellant's petitions for allowance of appeal. **See id.** at 1; **Commonwealth v. Moore**, 108 A.3d 35 (Pa. 2015). The United States Supreme Court denied Appellant's petition for writ of certiorari on November 2, 2015. **Moore v. Pennsylvania**, 136 S. Ct. 407 (2015).

Appellant timely filed a *pro se* PCRA petition, his first, on July 28, 2016. The PCRA court appointed Appellant counsel (PCRA counsel), who filed amended PCRA petitions on June 5, 2018.[2] The Commonwealth, after

_____

[2] We note there was a delay between July 2016 and October 2017 for the assignment of a presiding PCRA judge. It appears that PCRA counsel was

receiving continuances, filed motions to dismiss Appellant's PCRA petitions on March 20, 2019.

The PCRA court issued Pa.R.Crim.P. 907 notices of its intent to dismiss Appellant's petitions for lack of merit on April 23, 2019. Appellant did not respond. The PCRA court thereafter entered the orders dismissing Appellant's petition on May 23, 2019.

Appellant timely filed notices of appeal in both cases.[3] The PCRA court did not order Appellant to file Pa.R.A.P. 1925(b) statements, but filed Rule 1925(a) opinions explaining its decision.

_____

appointed in October 2017, but was either unavailable or requested a continuance before filing Appellant's amended PCRA petition in June of 2018.

[3] The certified records do not contain Appellant's notices of appeal. The copies of PCRA counsel's notice of appeal listed this Court's records are identical and caption both trial court case numbers. This Court issued a rule to show cause why the appeals should not be quashed under *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018). PCRA counsel responded that the electronic filing system was not functioning, but he "filed Notice of Appeal as of both matters," and "stressed to the Clerk that there must be notices of appeal for each Common Pleas Court docket per [*Walker*]." Resp. to Rule to Show Cause, 6/7/19, at ¶ 2. PCRA counsel asserted that his efforts resulted in the listing of two appellate docket numbers. *Id.* Further, PCRA counsel asserted that he "sought to fully comply with *Walker*," while acknowledging that his "Notice of Appeal included both Common Pleas Court docket numbers." *Id.*

In a subsequent motion to consolidate the two appellate court docket numbers, which this Court denied, PCRA counsel stated that the "[n]otices of appeal were filed separately as to the two distinct Common Pleas docket numbers per [*Walker*]." Mot. to Consolidate, 6/18/19, at ¶ 2. Neither the Commonwealth nor the PCRA court have discussed *Walker* or requested quashing the appeals.

Appellant presents the following questions for review:

1. Did the PCRA court err in dismissing Appellant's PCRA Petition without a hearing because trial counsel was ineffective for failing to file and litigate a [m]otion on double jeopardy grounds?

2. Did the PCRA court err in dismissing Appellant's PCRA Petition without a hearing because trial counsel was ineffective for failing to request that Sonia Leon be examined to determine whether she was competent to testify?

3. Did the PCRA court err in dismissing Appellant's PCRA Petition without a hearing because trial counsel was ineffective for failing to request a limiting instruction in relation to the firebombing of Marvin Williams' car?

4. Did the PCRA court err in dismissing Appellant's PCRA Petition without a hearing because trial counsel was ineffective for failing litigate Appellant's **Bruton** . . . issue at trial?

Appellant's Brief at 4.

Because Appellant presents his arguments as claims of ineffective assistance of counsel, we initially note the following principles that govern our review:

[O]ur standard of review from the denial of a PCRA petition is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal

---

Following our review, it appears that PCRA counsel properly filed two separate notices of appeal, one in each trial court case, but that the notices of appeal were otherwise identical. Under these circumstances, we conclude that Appellant perfected these appeals as required by **Walker**. **See Commonwealth v. J. Johnson**, 236 A.3d 1141, 1148 (Pa. Super. 2020) (*en banc*). However, we remind counsel that **Walker** requires that notices of appeal be separately filed and that a clerk of a court may not photocopy and place copies of a single notice of appeal in both records. **See J. Johnson**, 236 A.3d at 1146 n.5, 1148 n.9.

error. The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions.

Furthermore, to establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

We have explained that

[a] claim has arguable merit where the factual averments, if accurate, could establish cause for relief. Whether the facts rise to the level of arguable merit is a legal determination.

The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective. Moreover, a failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.

***Commonwealth v. Sandusky***, 203 A.3d 1033, 1043-44 (Pa. Super. 2019) (citations omitted and formatting altered), *appeal denied*, 216 A.3d 1029 (Pa. 2019).

Moreover,

[a] petitioner is not entitled to a PCRA hearing as a matter of right; the PCRA court can decline to hold a hearing if there is no genuine issue concerning any material fact and the petitioner is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings. A reviewing court on appeal must examine each of the issues raised in the PCRA petition in light of the record in order to determine whether the PCRA court erred in concluding that there were no genuine issues of material fact and in denying relief without an evidentiary hearing.

***Commonwealth v. Smith***, 121 A.3d 1049, 1052 (Pa. Super. 2015) (citations and quotation marks omitted).

### Failure to File a Pretrial Motion based on Double Jeopardy

Appellant first argues that his counsel was ineffective for failing to file a pretrial motion to bar his third trial, at which the jury found him guilty. Because consideration of the reasons for the mistrial at Appellant's second trial is crucial to Appellant's argument, we summarize the following background, as set forth by the trial judge at that time:

The case was sent to the jury for deliberations on September 21[, 2011].

\* \* \*

The alternate was dismissed at that time. There was no indication of any problems for the need to retain that alternate. The jury began their deliberations that afternoon. Instructed to return on the next day. On the 22nd of September all the jurors returned. However, Juror Number 10 was ill, visibly ill, was ultimately

transported from the court to Hahnemann Hospital by ambulance. The court spent most of Thursday and Friday trying to determine the status of Juror Number 10. Ultimately, speaking with him and made efforts to speak to hospital personnel. There was no clear indication as to how long the juror would be in the hospital and when and if he would be able to return.

On Monday, the 26th, we learned from Juror Number 10 that he had had surgery on his hand during the weekend for fractures. Efforts were again made to talk to hospital personnel.

On Tuesday, the 27th, the court learned from the juror, and also from the doctor, that he was to be released that afternoon. I spoke with the doctor, the doctor indicated that the juror was physically able to return, that medication the juror was taking would not interfere with the deliberation process. This was also confirmed by the juror.

All jurors were instructed to return on Wednesday morning. That would have been the 28th. In the presence of counsel the court spoke with Juror Number 10 as to his ability to continue deliberations. He indicated that he was able to do so and the jurors did resume their deliberations. The jurors deliberated on all day Wednesday, all day Thursday and most of the day on Friday. The jurors were instructed to return on Monday morning, October 3rd. Juror Number 10 did not appear, made no contact with the court. Efforts were made to contact the juror by telephone. And ultimately someone was sent, an officer assigned to the District Attorney's Office, was sent to try to find out what was going on with Juror Number 10.

I believe that contact, from the testimony this morning[, October 4, 2011], was made somewhere between 12:00 and 1:00 p.m. yesterday. Efforts were made to have the Sheriff's Office pick up the juror this morning to make sure the juror was present. However, Juror Number 10 did appear on his own [on October 4, 2011].

N.T., 10/4/11, at 38-40.

The trial judge examined Juror Number 10 on October 4, 2011, as well as Officer Nicholas DeNofa, who was assigned to the District Attorney's Office and contacted Juror Number 10 on October 3, 2011. Co-defendant's counsel

thereafter moved for a mistrial, arguing that Juror Number 10 should not proceed as a juror and stating, in part, that he wanted twelve jurors deliberating. *Id.* at 34. Appellant's counsel at the time joined co-defendant's motion and set forth additional arguments in support of a mistrial. *Id.* at 34. When asked by the trial judge if Appellant would proceed with eleven jurors, Appellant's counsel asserted that she consulted with Appellant and would not proceed with eleven jurors. *Id.* at 37. The Commonwealth objected to a mistrial, suggesting that Juror Number 10 could resume deliberations. *Id.* at 31.

The trial court granted the joint motion for mistrial in Appellant's second trial finding manifest necessity due to Juror Number 10's "unforeseen illness and absence during deliberations." *Id.* at 38. Appellant's third trial began in September 2012, and the jury found him guilty on September 25, 2012.

In the underlying PCRA proceeding, Appellant claimed that his counsel was ineffective for failing to file a motion to dismiss "alleging that the matter should be dismissed on double jeopardy grounds because the [trial judge at the second trial] *sua sponte* granted a mistrial in the absence of grounds justifying terminating the case." Am. PCRA Pet., 6/5/18, at 4. Appellant further alleged that the trial judge "declared a mistrial without first exploring alternate remedies with [Appellant] himself about an appropriate remedy" and that "trial counsel at the time, did not consult with [Appellant] before agreeing to a mistrial either." *Id.*

- 10 -

The PCRA court dismissed Appellant's claim, emphasizing that "[the trial court at the second trial] did not, as [Appellant] claim[ed], *sua sponte* declare a mistrial." PCRA Ct. Op., 7/26/19, at 8. The PCRA court concluded that Appellant's claim was "belied by the record and meritless." *Id.* at 7.

On appeal, Appellant maintains that his counsel was ineffective for failing to bar his third trial based on the trial court's *sua sponte* declaration of mistrial at his second trial. Appellant's Brief at 8-17. Appellant adds, "Contrary to the PCRA court's [o]pinion, there is nothing in the [r]ecord that shows that trial counsel moved for mistrial." *Id.* at 16.

The Commonwealth counters that the PCRA court properly dismissed Appellant's ineffectiveness claim. Commonwealth's Brief at 8. The Commonwealth states Appellant's claim rests on a "false premise" that trial court *sua sponte* declared a mistrial at the second trial. *Id.*

Following our review, we agree with the PCRA court and the Commonwealth's respective assessments that the record belies Appellant's claim and that his legal arguments proceed from a faulty premise. As noted above, Appellant's counsel at his second trial joined in a motion for mistrial based on Juror Number 10's illness, absences from deliberations, and apparent inability to proceed in further deliberations. *See* N.T., 10/4/11, at 34, 37, 38. As Appellant's second trial did not end in a *sua sponte* declaration of a mistrial, Appellant's extensive discussion of such cases is misplaced. *See Commonwealth v. Kearns*, 70 A.3d 881, 884 (Pa. Super. 2013) (noting the general rule that the double jeopardy clause does not bar retrial when a

- 11 -

defendant moves for a mistrial absent misconduct by the Commonwealth); *see also Commonwealth v. K. Johnson*, 231 A.3d 807, 826 (Pa. 2020) (noting that "prosecutorial overreaching sufficient to invoke double jeopardy protections [under the Pennsylvania Constitution] includes misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result"). Accordingly, the record supports the PCRA court's findings, and Appellant fails to demonstrate any legal error in the PCRA court's dismissal of Appellant's claim for a lack of arguable merit. *See Sandusky*, 203 A.3d at 1043; *Smith*, 121 A.3d at 1052.

**Failure to Challenge the Competency of Sonia Leon**

Appellant's next claims that his counsel at his third trial was ineffective for failing to request an examination of Sonia Leon to determine if she was competent to testify. Appellant notes that Leon testified that she was not taking medication for her mental health issues. Appellant's Brief at 17 (citing N.T., 9/12/12, at 78-79). Appellant emphasizes that "her testimony shows an angry and obstreperous witness who not only had to be admonished numerous times to act appropriately, but also one who admitted she was a liar and whose testimony [at trial] contradicted prior testimony and statements given by her." *Id.* at 17-18. Appellant further notes that Leon's testimony established that he, not co-defendant, called one of the victims shortly before the shooting and thereby implicated him in the killings. *Id.* at 18.

The Commonwealth responds that Appellant "did not identify any deficiency in Ms. Leon's capacity to testify." Commonwealth's Brief at 9. The Commonwealth asserts Appellant's arguments, "while certainly relevant to the weight of the evidence, do no undercut Ms. Leon's competence." *Id.* According to the Commonwealth, Appellant's underlying claim of ineffectiveness amounts to an attack not on Leon's competence, but her ability to testify in a "searing and compelling manner." *Id.* at 10. The Commonwealth adds that Appellant cannot show prejudice, noting that he did not establish that "had counsel raised the issue, Ms. Leon would have been found incompetent **and** . . . without her testimony, he would likely have been acquitted." *Id.*

The PCRA court concluded, in part, that Appellant did not establish his claim of ineffectiveness had arguable merit. PCRA Ct. Op. at 10. The PCRA court explained: "[Appellant] assert[ed] that a competency hearing should [have been] given to a witness who act[ed] inappropriate[ly] on the stand, admit[ed] to lying, or whose testimony contradict[ed] earlier statements. This is not the standard for ordering a competency hearing . . . ." *Id.* The PCRA concluded that Appellant's claim of ineffectiveness failed and that no relief was due. *Id.*

In **Commonwealth v. Boich**, 982 A.2d 102, 109-10 (Pa. Super., 2009) (*en banc*), this Court summarized the principles governing a challenge to the competence of a witness.

Pennsylvania Rule of Evidence 601 provides, in pertinent part:

**Rule 601. Competency**

**(a) General Rule.** Every person is competent to be a witness except as otherwise provided by statute or in these Rules.

**(b) Disqualification for Specific Defects.** A person is incompetent to testify if the Court finds that because of a mental condition or immaturity the person:

(1) is, or was, at any relevant time, incapable of perceiving accurately;

(2) is unable to express . . . herself so as to be understood either directly or through an interpreter;

(3) has an impaired memory; or

(4) does not sufficiently understand the duty to tell the truth.

Pa.R.E. 601 (emphasis added). This rule is expressly intended to preserve existing Pennsylvania law. In general, the testimony of any person, regardless of her mental condition, is competent evidence, unless it contributes nothing at all because the victim is wholly untrustworthy. Thus, in Pennsylvania, a witness is presumed competent to testify, and it is incumbent upon the party challenging the testimony to establish incompetence. Above all, given the general presumption of competency of all witnesses, a court ought not to order a competency investigation, unless the court has actually observed the witness testify and still has doubts about the witness' competency.

Claims that a witness' memory has been corrupted by insanity, mental retardation, hypnosis, or taint go to the competency of that witness to testify. The capacity to remember and the ability to testify truthfully about the matter remembered are components of testimonial competency. The party alleging a witness is incompetent to testify must prove that contention by clear and convincing evidence.

*Boich*, 982 A.2d at 109-10 (some citations and footnote omitted, some formatting altered).

Instantly, prior to jury selection for Appellant's third trial, the Commonwealth raised an oral motion *in limine* indicating that "in the abundance of caution, candor and efficiency[, the Commonwealth sent a letter to the trial judge[4]] on Ms. Leon." N.T., 9/10/12, at 11-12. The following exchange occurred:

THE COURT: All right. You're satisfied that that's been resolved?

[The Commonwealth]: I am satisfied that she is fully aware and understanding where she is and everything, and we had a discussion in our office where we talked about the case.

THE COURT: Okay.

[The Commonwealth]: [Co-defendant's counsel] wants to inquire as to her bipolar disorder. I would move to preclude that. If she gets on the stand, then she's fine. It wouldn't be relevant, and it would be overly prejudicial to Ms. Leon's testimony.

[Co-defendant's Counsel]: Your Honor, if I may just say a few things?

THE COURT: Yes.

[Co-defendant's Counsel]: This is, you know, the third round. We've been through two other trials to completion. This Ms. Sonia Leon has testified at all of these occasions. We were just given this information by the Commonwealth last week saying that this woman may not be competent. It doesn't say when, where, how. There is no information whatsoever given to us the nature and circumstances behind this woman's competency.

THE COURT: Behind what?

[Co-defendant's Counsel]: Behind her competency.

---

[4] The correspondence referred to by the Commonwealth was not made part of the record. However, it appears that the Commonwealth's letter stated that the Commonwealth believed she was incompetent. *See* N.T., 9/11/12, at 6-7.

- 15 -

THE COURT: Well, who says she is not competent?

[Co-defendant's Counsel]: The Commonwealth brought the issue up.

THE COURT: I understand that.

[Co-defendant's Counsel]: All I'm asking for, and maybe this is not the right time, but putting the [trial c]ourt on notice, the defense should be allowed to ask questions of her regarding her prior -- we're going to be asking her questions about her prior testimony and is it fair enough game if she came in that day under the influence of alcohol. That would have been fair questions for subsequent counsel to ask questions about. What I'm saying is the defense will be -- we will need to ask her questions regarding whether or not or what stage, what her ability to perceive what the events were the day she testified.

THE COURT: Well, I am not concerned about her ability. I think he is not necessarily concerned about her ability to perceive events on the day she testified. We're really concerned about her ability to observe on the day of the incident, the day when she witnessed the incident, right?

[Co-defendant's Counsel]: Yes and no. I mean, you're right. It certainly goes to the incident. We have no information. Had she had this her whole life? Is it something that came up six months ago? I have no information on that. So at the right time -- if this is not the right time, I will address it later.

THE COURT: Well, I think my real question is whether a person who has a bipolar disorder is generally otherwise thought not to be able to perceive whatever it is they perceived. You know, it's not like somebody who has schizophrenia or some other sort of mental health disability. But you know what, let me tell you what. I suppose you could ask these couple of limited questions: Has she ever had mental health treatment. If so, what was the diagnosis. Does it require medications. Was she on her medications at the time of the incident. Those four questions you may ask her.

[Co-defendant's Counsel]: Fair enough. Thank you, Your Honor.

THE COURT: And that would be actually -- you would want to know in terms of was she on her medications at the time that she observed whatever she observed back in May of 2005.

N.T., 9/10/12, at 11-15.

The Commonwealth called Leon to testify at the third trial on September 12, 2012. After Leon answered several questions from the Commonwealth, Appellant counsel at the time requested a sidebar conference, which the trial court granted. N.T., 9/12/12, at 15. At the conference, Appellant's counsel stated that Leon appeared to be "under the influence of some type of drug and/or alcohol." *Id.* at 15. According to Appellant's counsel, Leon's speech was slurred, her eyes were "dimming" and "closed," and her eyes appeared to be "red" and "glassy." *Id.* at 15-16. Appellant's counsel requested that the trial court rule on Leon's competence to testify.

The trial court denied the request, explaining:

> The [c]ourt has listened to the witness' testimony and the [c]ourt does agree that her -- that she does have some speech affectation, I would call it. I mean, I wouldn't call it slurred, but she has a speech pattern that's different from most people, but she -- the [c]ourt also observed that] she has responded promptly and competently to all questions that have been put to her. So I'm not going to grant your request that she be declared incompetent. But I will allow you to explore with her whether she has in fact taken any mind-altering substances prior to coming to court today.

*Id.* at 16.

Leon thereafter testified for the Commonwealth without any incident, although Leon admitted that during the investigation into the shootings, she was not forthcoming in her statements to police and made a false report to police that cash and home electronics were missing from her home. *See id.* at 60, 65, 67-69. On cross-examination, which began on September 12,

2012, and continued on the next day of trial, September 17, 2012, Leon admitted that she was diagnosed with bipolar disorder in 2003, but threw away the medications for her condition. *Id.* at 78. During cross-examination, Leon demonstrated a lack of decorum, hostility to questioning by Appellant's counsel, and uncooperativeness with Appellant's counsel and at times, toward the trial court. *See e.g. id.* at 80 (indicating that Leon raised her middle finger at Appellant's counsel), 84-85 (indicating that Leon threw an exhibit on the floor), 115 (indicating that Leon felt that Appellant's counsel was "getting smart with [her]"); N.T., 9/17/12, at 13-16 (indicating that Leon refused to accept an exhibit from Appellant's counsel and threatened to "flick" the document to the floor even when the trial court asked her to take the document).

Based on this record, we conclude that the record supported the PCRA court's determination that Appellant's references to Leon's episodes of anger, obstreperousness, and admissions to lying to police did not provide a proper basis to challenge Leon's competency as a witness. *See* PCRA Ct. Op. at 10. Further, Appellant's counsel at the time extensively cross-examined Leon and the jurors, as the finders of fact, were able to observe Leon's responses in order to make their credibility and factual determinations. Accordingly, we discern no legal error in the PCRA court's conclusion that Appellant's claim of ineffectiveness to request a competency hearing for Leon lacked arguable merit. *See Sandusky*, 203 A.3d at 1043. Therefore, we agree with the PCRA

court that no relief was due. *See Sandusky*, 203 A.3d at 1043; *Smith*, 121 A.3d at 1052. Therefore, we agree with the PCRA court that no relief was due.

**Failure to Request a Limiting Instruction**

Appellant next claims that the PCRA court erred in dismissing his claim that his counsel at his third trial should have requested a limiting instruction to the jury regarding Marvin Williams' testimony that his car was firebombed. By way of background to this claim, Marvin Williams inculpated Appellant in his statement to police and his testimony at the preliminary hearing. However, at Appellant's first two trials, Marvin Williams refused to adopt his statement and preliminary hearing testimony.

At the third trial, Marvin Williams again refused to adopt his prior statement and testimony at the preliminary hearing. After the Commonwealth confronted him with his preliminary hearing testimony, the Commonwealth asked whether something happened to his car. N.T., 9/18/12, at 88. Appellant's counsel objected and at a sidebar conference, the Commonwealth indicated that it intended to elicit testimony that Marvin Williams received information in 2007 that his car "got firebombed." *Id.* at 90. Specifically, counsel for the Commonwealth stated:

> My argument is [Marvin Williams] went south because he's scared, because he had knowledge of something that happened right in front of his mother's house where she still lives. It doesn't need to be true to change someone's testimony in order to have that effect on his state of mind. It doesn't need to be true. Could be lies, lies, lies. That's why it's not offered for the truth. It's offered for his state of mind.

*Id.*

Appellant's counsel asserted that there was no evidence that Marvin Williams' car was damaged and the admission of the testimony would be unduly prejudicial. *Id.* at 95-96, 97. The trial court overruled the objection, and Marvin Williams testified that his mother told him someone set his car on fire and that he did "not know" but believed it "probably [happened] because of testimony and stuff . . . ." *Id.* at 102-04. The Commonwealth also elicited testimony from Marvin Williams that he heard the car was burned across the street from his mother's house and that his mother was living in the same house at the time of the third trial. *Id.* at 110-11.

Appellant challenged the admissibility of Marvin Williams' testimony about the car in his direct appeal, and this Court affirmed the trial court's ruling. *Moore*, 717 EDA 2013, at 13-16. This Court emphasized that the evidence was not admitted for the truth of the matters asserted, was probative of the change in Marvin Williams' statements, and was not unfairly prejudicial to Appellant merely because it was harmful to his case. *Id.* at 14-15.

In the underlying PCRA proceeding, Appellant asserted that his counsel at his third trial was ineffective for failing to request an instruction that the jury should not consider Marvin Williams' testimony for the truth of the matter asserted, namely, that the car was firebombed and that Appellant was involved in the firebombing of the car. Am. PCRA Pet. at 11-12. In support of his assertion that there was arguable merit, Appellant relied on *Commonwealth v. Billa*, 555 A.2d 835 (Pa. 1989). *Id.* at 25-27.

- 20 -

Appellant further asserted that he suffered prejudice because without the limiting instruction, "it was left for the jurors to make several improper inference of both law and fact." *Id.* at 25-26.  Appellant continues:

As an issue of law, the jurors, wholly unfamiliar with evidentiary rules, were incorrectly left to decide the purpose of this evidence and the inferences they could properly draw from this evidence. Specifically, the jurors would have incorrectly assumed that they legitimately could use this evidence as evidence of both [Appellant]'s guilt and character.  As an issue of fact, the jurors were left to impermissibly assume that: (1) [Appellant] had a threatening, violent, and manipulative reputation; and/or (2) [Appellant] intimidated witnesses and/or recruited others to intimidate witnesses.  Based on the totality of the evidence presented at [Appellant's] trial, a reasonable probability exists that the outcome of his trial would have been different had trial counsel sought these necessary limiting instructions . . . .

*Id.* at 27.

The PCRA court dismissed Appellant's claim concluding that Appellant "offer[ed] no binding legal authority requiring relief due [the] lack of a limiting instruction in these situations."  PRCA Ct. Op. at 11.  The PCRA court acknowledged Appellant's reliance on *Billa*, but discussed *Commonwealth v. Reid*, 99 A.3d 427 (Pa. 2014), to suggest that "it is not always necessary to give a limiting instruction, especially when the evidence only implies criminal activity."  *Id.* at 12-14.  The PCRA court further concluded that Appellant could not establish prejudice because there was "sufficient and overwhelming" evidence of Appellant's involvement in the shooting deaths of Jermaine Williams and Kennedy.  *Id.* at 14.

- 21 -

In the present appeal, Appellant largely restates the arguments he set forth in his amended PCRA petition. *See* Appellant's Brief at 19-40. Appellant further argues that "[t]he PCRA court fail[ed] to address this issue in a meaningful manner and glosse[d] over the substantial prejudice caused to Appellant." *Id.* at 40.

The Commonwealth, in response, emphasizes that it only introduced evidence that Marvin Williams "**believed** that his car had been firebombed in retaliation for his preliminary hearing testimony" and that "[t]here was no suggestion that this testimony could be used as substantive evidence of [Appellant's] guilt." Commonwealth's Brief at 11 (emphasis in original). The Commonwealth adds that the defense strategy at the third trial was to "portray Marvin Williams . . . as the actual killer . . . ." and emphasize that Marvin Williams was involved in the drug trade and had other enemies. *Id.* at 12-13. Furthermore, the Commonwealth asserts that "[n]othing suggests the jury imputed this tangential issue in Marvin [Williams'] testimony to [Appellant], or that the jury's verdict was based in any part on this peripheral matter, rather than the overwhelming direct and circumstantial evidence of [Appellant's] guilt." *Id.* at 13.

In *Commonwealth v. Hutchinson*, 25 A.3d 277 (Pa. 2011), our Supreme Court considered a claim that an appellant's claim of ineffectiveness for failing to request a limiting jury instruction regarding prior bad acts. The *Hutchinson* Court rejected the claim, noting:

This Court has held that when evidence of a defendant's prior criminal conduct or bad acts is admitted, the defendant is entitled upon request to a jury instruction explaining the limited purpose of such evidence.

In *Billa*, we granted the appellant a new trial after concluding that his counsel was ineffective for failing to request a limiting instruction. The appellant had been found guilty of the first-degree murder of a sixteen-year-old girl with whom he had been attempting to establish a relationship. The trial court had admitted, over defense counsel's vigorous objection, testimony concerning a violent sexual assault on a different victim that had been committed by the appellant approximately two months before the murder. The two attacks bore numerous similarities, including the fact that both victims were young Hispanic females. Although we noted that the testimony of the sexual assault victim was vivid, graphic, highly prejudicial, and potentially emotional, we held that it was properly admitted because of its relevance to proving the appellant's motive and intent and the absence of accident. Nonetheless, we also held that trial counsel was ineffective for failing to request an appropriate limiting instruction. We recognized that the highly inflammatory testimony of the prior sexual assault victim "created the substantial danger that the jury could be swayed in its deliberations . . . by this evidence showing [the] appellant's criminal character and his propensity to sexually assault young Hispanic females." In addition, we recognized that the evidence in question was not merely a fleeting or vague reference to the appellant's criminal record, but rather was extensive as well as inflammatory, comprising a substantial component of the Commonwealth's case and garnering an emphasis in closing argument. Accordingly, "[a]n appropriate limiting instruction . . . would not have increased the jury's awareness of the prior sexual assault, but it well might have placed its limited legal significance in proper perspective." We concluded that the *Billa* appellant's counsel was constitutionally ineffective for failing to request an appropriate limiting instruction as to the permissible use of evidence of the prior sexual assault, and we therefore awarded the appellant a new trial.

In the instant case, the relevant circumstances have little, if anything, in common with those of *Billa*, and we decline to hold that trial counsel was ineffective for failing to request a limiting instruction. The bad acts evidence of which [Hutchinson] complains was not inflammatory, not graphic, and not extensive. Some of the evidence was elicited as a single sentence in passing

during cross-examination of the witnesses by defense counsel. In closing argument, the Commonwealth did make reference to [Hutchinson's] abuse of the victim, but did not mention the other bad acts. Under these circumstances, an instruction as to the bad acts evidence may very well have served only to re-emphasize the evidence to the jury. More importantly, [Hutchinson] has not established prejudice, *i.e.*, he has failed to demonstrate that there is a reasonable probability that the outcome of his trial would have been different but for the lack of a limiting instruction. We have previously noted the "overwhelming evidence" of [Hutchinson's] guilt. In light of this overwhelming evidence, which includes eyewitness testimony of the victim's two children, both of whom knew [Hutchinson], [Hutchinson] has failed to suggest how he could have been prejudiced by counsel's failure to request a limiting instruction such that there is a reasonable probability that the outcome of his trial would have been different. There is no merit to [Hutchinson's] claim of trial counsel ineffectiveness with regard to a limiting instruction . . . .

*Hutchinson*, 25 A.3d at 305-06 (citations omitted).

Following our review, we conclude that the instant case is closer to *Hutchinson* than *Billa*. Marvin Williams' testimony that someone set his car on fire and that he believed it was related to his preliminary hearing testimony was not inflammatory, or graphic, and the Commonwealth's questioning and Marvin Williams' responses were both limited. Specifically, Marvin Williams testified that his mother told him that "someone set it [the car] on fire[,]" and when the Commonwealth asked "why [he] believe[d] that happened," he responded: "I don't know. Probably because of testimony and stuff. I don't know." N.T. 9/18/12, at 102-04. Unlike *Billa*, this testimony was not graphic or extensive, nor did it explicitly implicate Appellant.

Furthermore, given the purpose and nature of Marvin Williams' testimony about his car, we disagree with Appellant's argument that he was

prejudiced by the absence of a cautionary jury instruction. As noted above, the testimony did not expressly implicate Appellant. Appellant and co-defendant had ample opportunity at the third trial to establish that there was no objective corroboration of Williams' belief that a car was set on fire, impeach William's credibility on the basis that the car in question was not registered to Williams, and suggest other individuals had motive to damage the car. The Commonwealth, in its closing statements, did not unduly emphasize the evidence, suggest Appellant's involvement, or urge the jury that the evidence constituted consciousness of guilt.

Based on the foregoing, Appellant did not establish his ineffectiveness claim regarding the failure to request a limiting jury instruction warranted relief.[5] Accordingly, we discern no error in the PCRA court's dismissal of this claim. *See Sandusky*, 203 A.3d at 1043-44; *Smith*, 121 A.3d at 1052.

## Failure to Litigate a *Bruton* Issue

In his final claim, Appellant contends that the PCRA court erred in dismissing his claim that his counsel failed to raise a *Bruton* objection when

---

[5] We note that while the PCRA court relied on *Reid*, that case is different from the instant case. In *Reid*, the challenged evidence giving rise to the jury instruction claim related to the appellant's general association with a gang, rather than evidence of a specific act or crime. *See Reid*, 99 A.3d at 451-52. Moreover, *Reid* involved a jury instruction with respect to imposition of the death penalty, and the trial court instructed the jury that it was required to find a significant history of felony convictions involving use of threats or violence when deliberating on the existence of aggravating factors. *See id.* Nevertheless, the PCRA court's statements that not all failures to request a limiting instruction will result in a viable ineffective assistance of counsel claim remains apt for the reasons discussed above.

the Commonwealth confronted Marvin Williams with Williams' prior statement to police. The exchange referred to conversations Williams had with co-defendant in prison after the shooting, included references to Appellant's nickname, "Third," and read as follows:

[Commonwealth]. The next question [in the prior statement to police]:

What did you and [co-defendant] talk about?

"Answer: The shootings.

"Question: What did [co-defendant] tell you about the shootings?

"Answer: He said that he shot Dre [*i.e.* Kennedy] twice in the head and five times in the chest. **[Co-defendant] was worried about Third running his mouth**.

"Question: Did [co-defendant] tell you why he killed Dre?

"Answer: About a week-and-a-half before this happened, [co-defendant] told me he was going to get Dre, but he did not say why.

"Question: Did you ever speak to Third since the shooting?

"Answer: No.

N.T., 9/17/12, at 215-16 (emphasis added). It appears that in the prior two trials and the preliminary hearing, the Commonwealth did present the portion of Marvin Williams' statement referring to co-defendant's concerns about Appellant.

In the underlying PCRA proceeding, Appellant challenged his counsel's failure to litigate a ***Bruton*** objection arguing:

In the present matter, [co-defendant] confessed to fellow inmate, Marvin Williams, to the killings . . . herein. [Co-defendant] was

- 26 -

afraid that [Appellant] ("Third") would run his mouth about the killings.

[Co-defendant] did not testify. [Co-defendant] could only know that [Appellant] was involved in the killings if [co-defendant] was at the scene of the killings with [Appellant]. [Co-defendant] could only know that [Appellant] had motive to run his mouth if he knew and/or was involved in the killings.

Trial counsel had no reasonable basis for not seeking severance or at least redaction at a very minimum.

[Appellant] was prejudiced by [trial] counsel's failure to properly object [at the third trial], failure to preserve this issue on appeal, and failure to litigate this issue on appeal. [Appellant] was prejudiced because the jury could only infer that that [Appellant] was involved in the murders and, moreover, [Appellant] was unable to confront a key witness against him.

Am. PCRA Pet. at 32-33.

The PCRA court dismissed Appellant's claim, noting that co-defendant's statement "did not implicate [Appellant] as a participant of crime" but only indicated co-defendant fear that Appellant "would tell someone about the shooting." PCRA Ct. Op. at 15. The PCRA court reasoned:

Here, [Appellant's] name was not redacted because Marvin Williams' testimony did not implicate him in the crime. Instead, the statement simply implicated that [Appellant] knew something about the killings and that Alexander was worried that he would run his mouth. Through other properly admitted evidence, [Appellant] was also implicated as a participant in the killings. However, since this implication did not result from Marvin Williams' testimony as to what [co-defendant] told him while incarcerated, no **Bruton** violation occurred.

Therefore, this claim fails and no relief is due.

*Id.* at 15-16 (citation omitted).

- 27 -

Appellant essentially restates the claim he presented to the PCRA court. Appellant summarizes the law governing **Bruton** claims, Appellant's Brief at 40-46, and asserts the same ineffective assistance of counsel claim set forth in his amended PCRA petition, **see id.** at 46-47; **see also** Am. PCRA Pet. at 32-33.

The Commonwealth responds that no relief is due. Commonwealth's Brief at 14. Similar to the PCRA court, the Commonwealth contends that **Bruton** is inapposite because co-defendant's statement did not incriminate Appellant and only conveyed co-defendant's concern that Appellant was "indiscrete." **Id.** The Commonwealth also states that Appellant "failed to show that in the absence of this testimony from Marvin Williams, it was likely he would have been acquitted." **Id.**

Our Supreme Court has stated:

> In **Bruton**, the United States Supreme Court held that the admission into evidence of an extrajudicial statement of confession by non-testifying co-defendant A inculpating co-defendant B in the crime, violated co-defendant B's right of cross-examination under the Confrontation Clause of the Sixth Amendment. In other words, as the High Court stated subsequently in **Richardson v. Marsh**,[ 481 U.S. 200, 206 (1987)], "where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." In reaching this holding, the High Court reasoned that, even if the jurors were instructed to the contrary, there remained a substantial risk that they would look to co-defendant A's incriminating extrajudicial statement in assessing co-defendant B's guilt. Thus, in **Bruton**, the High Court created a narrow exception to the general legal principle that the jury is presumed to follow the court's instructions.

*Commonwealth v. Roney*, 79 A.3d 595, 623-24 (Pa. 2013) (some citations omitted).

Nevertheless, redaction is "an appropriate method of protecting defendant's rights under the *Bruton* decision." *Commonwealth v. Rainey*, 928 A.2d 215, 227 (Pa. 2007) (citation omitted). Discussing the High Court decision in *Richardson*, our Supreme Court explained:

> Therein, the Court held that the "Confrontation Clause is not violated by the admission of a non-testifying co-defendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Consistent with the High Court's pronouncement and our own line of cases, we have held that substituting the neutral phrase "the guy" or "the other guy" for the defendant's name is an appropriate redaction.

*Commonwealth v. Cannon*, 22 A.3d 210, 218 (Pa. 2011) (citations omitted).

To the extent Appellant contends that the above-recited testimony implicated *Bruton* such that severance from co-defendant was required, we agree with the PCRA court no relief is due. Specifically, even if Marvin Williams' passing reference to co-defendant's concern that Appellant was "running his mouth" was incriminating, the trial court could have redacted the statement and issued a cautionary instruction, such that a joint trial would have been proper. *See Cannon*, 22 A.3d at 218. Therefore, Appellant failed to establish arguable merit to his claim that trial counsel should have moved for severance based on *Bruton*. *See Sandusky*, 203 A.3d at 1043.

To the extent Appellant argues that his trial counsel at the third trial was ineffective for seeking redaction, our review reveals no basis to find either arguable merit or prejudice to Appellant's claim. As noted by the PCRA court, Marvin Williams' recitation of co-defendant's confession and beliefs regarding Appellant was not the type of powerfully incriminating evidence triggering **Bruton** concerns. **See** PCRA Ct. Op. at 15-16.

Moreover, Appellant has not demonstrated there was a reasonable possibility that the outcome at trial would have been different had Appellant's counsel at the third trial objected and obtained a redaction and cautionary instruction. Specifically, to the extent Appellant argues that co-defendant's statement was prejudicial, the record establishes that other witnesses provided prior statements that Appellant boasted about the shooting at a party while brandishing a firearm. Appellant also fails to acknowledge that Marvin Williams also provided his prior statement and preliminary hearing testimony directly implicating Appellant in the shooting. Therefore, the record belies Appellant's assertion that his counsel's failure to move for redaction and a cautionary instructed resulted in prejudice. Accordingly, we affirm the PCRA court's decision to dismiss this claim. **See Sandusky**, 203 A.3d at 1043-44; **Smith**, 121 A.3d at 1052.

For the reasons stated herein, we discern no basis to disturb the trial court's ruling to dismiss Appellant's claims. Moreover, because our review reveals no issues of fact requiring an evidentiary hearing, we affirm the PCRA

court's order dismissing Appellant PCRA petition.  **See Sandusky**, 203 A.3d

at 1043-44; **Smith**, 121 A.3d at 1052.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/08/2020